October 16, 1998

1-97-2263

SPECTRAMED INC., ) Appeal from the

 ) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) 

) 

GOULD INC., ) Honorable

) Lester D. Foreman,

Defendant-Appellee. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court: 

Spectramed Inc. (Spectramed) purchased the assets of a medical products business owned by Gould Inc. (Gould) including certain patents owned by Gould.  Two patent infringement claims involving Gould products were made against Spectramed and it filed a declaratory action against Gould seeking recovery of litigation and settlement losses in defending these claims.  Spectramed appeals the circuit court's grant of summary judgment in favor of Gould, and presents as issues whether:  Spectramed was entitled to summary judgment since Gould was responsible for defending and paying the infringement claims because they arose before the closing of the Gould-Spectramed Asset Purchase Agreement (Agreement); Gould breached three warranties found in section 4.07 of the Agreement; Spectramed was required to prove reasonable reliance on a Gould warranty; and the court should have given effect to a Gould letter purporting to agree to Spectramed's indemnification.

Gould, interested in selling its Medical Products Group (Group) in 1985, prepared an offering  memorandum for prospective purchasers describing the Group as a "leading manufacturer of physiological monitoring devices *** addressing the worldwide hospital market."  Two of the Group's products were reusable and disposable blood pressure transducers, the subjects of the present patent infringement claims.  The Gould memorandum asserted that "[p]atents are held [by Gould] for key design features" of the transducers.

Douglas R. Hillier, employed intermittently by Gould and its predecessor corporation between 1971 and 1986, was in charge of marketing Gould's medical products, including transducers.  He later became Gould's director of operations for manufacturing transducers and other products, but left Gould in November 1983 to work for a predecessor of Baxter Healthcare Corporation (Baxter), where he became familiar with transducers manufactured by Baxter.  Hillier returned to Gould in May 1984 as president of the Group's Cardiovascular Products Division, and there directed the routine evaluation of competitors' transducers.

When Gould announced its intention to sell the Group, some 35 of the Group's managers (Managers), including Hillier, expressed their interest in its acquisition.  R.J. Aplin, a Group vice-president, consulted Kelso & Company (Kelso), an investment banking firm that specialized in leveraged buyout transactions, and negotiated the purchase by the Managers, with the assistance of the buyers' attorneys and Kelso's financial advisors.  The Managers invested approximately $1 million in the $100 million acquisition, the remainder of which was financed by Kelso, other investors, and bank loans.

On April 25, 1986, Kelso issued a written offer on its own behalf and on behalf of Aplin and all the Managers, to purchase the Group's assets and businesses, "subject to specified liabilities."  The offer provided that, upon its acceptance, Kelso and the Managers would form a new company and prepare the Agreement, which would include indemnity provisions "with respect to, among other things, all events arising on or prior to the closing, litigation, tax liabilities, product performance, product liability and qualified benefit plans."  Gould accepted the offer on May 6, 1986.

The closing date for the Agreement was October 10, 1986.  The buyer was identified as MPG Acquisition Corporation, subsequently renamed Spectramed.  Aplin became chairman of the board, president and chief executive officer, and Hillier became division president and corporate officer.  Other Managers also became Spectramed officers and directors. 

One week before the closing, on October 3, 1986, Utah Medical Products, Inc. (Utah Med), sent a letter to Hillier in his capacity as a Gould officer, advising him of its September 1986 receipt of a patent (Wallace patent) for transducers.  Hillier forwarded the letter to B. Moran, a Group vice-president, who was in charge of patent matters, and also told Aplin about the letter.  On October 6, Moran forwarded the letter to Spectramed's patent attorney, who subsequently advised Spectramed that its transducers did not infringe the Wallace patent.  This advice was reduced to writing in December 1986.  A second law firm agreed that the Wallace patent was invalid, and suggested that Spectramed either ignore the Utah Med letter, send the company a letter expressing its belief that the patent was invalid, or file for reexamination or declaratory judgment to invalidate the patent.  Based upon this advice, Moran suggested to Hillier that Spectramed file for reexamination.

Moran and Hillier met with representatives of Utah Med on December 2, 1986.  Utah Med proposed the grant of a license for the Wallace patent to Spectramed for between $250,000 and $400,000.  Ten days later, Spectramed advised Gould of Utah Med's potential claim.  It also asserted its belief that Gould was liable for any losses suffered by Spectramed pursuant to section 6.05 of the Agreement.  Spectramed noted further that it had hired Gould's former attorneys to handle the matter, to which Gould was invited to object, and subsequently provided Gould with the legal opinion letters it had obtained from the attorneys on the validity of the Wallace patent.  On February 5, 1987, Gould responded to Spectramed's letter, stating that its present patent lawyers found no infringement of any valid Utah Med claims; it did not object to Spectramed's choice of legal representation; and it agreed with Spectramed's interpretation of section 6.05 as to Spectramed's continued manufacture and sale of certain products existing as of October 10, 1986, but not to any modification of those products.

In March 1987, Spectramed requested federal Patent and Trademark Office reexamination of Utah Med's patent, a copy of which was forwarded to Gould.  During the reexamination process, in December 1987, Baxter acquired Utah Med's rights to the Wallace patent.  On June 21, 1988, Baxter received a reexamination certificate narrowing some of its original patent claims, and confirming that the remaining claims were patentable.

On February 23, 1989, Baxter filed suit against Spectramed in a California federal district court, alleging infringement of both the original and reexamined patents.  On May 9, Spectramed informed Gould of the suit and also that Spectramed had been acquired by British Oxygen Corporation.  Gould was invited to discuss these events with Spectramed's counsel.  Gould responded that it was not liable either to Spectramed or Baxter. 

A federal jury found the Wallace patent to be enforceable and that Spectramed's products infringed the patent.  Notwithstanding the verdict, the district court granted Spectramed's motion for judgment as a matter of law, finding no patent infringement.  The federal appellate court reversed, holding that Spectramed's products infringed the patent, and remanded the case to the district court for a determination of the patent's validity.  
Baxter Healthcare Corp. v. Spectramed, Inc.
, 49 F. 3d 1575 (Fed. Cir. 1995) (
Baxter I
).

During the litigation of the Wallace patent, on June 17, 1987, Spectramed was notified of a second claim for patent infringement by its transducers.  The claim was based on another patent, the McCord patent, which had been granted on September 10, 1985.  In two letters dated August 8 and August 20, 1987, Spectramed informed Gould of the McCord claim, citing the indemnity provisions of the Agreement.  Gould responded that because the owner of the patent did not mark its products with a patent number, "there is no constructive notice of the patent" and therefore no liability for infringement.  Gould declined to participate in the litigation of that claim. 

Baxter acquired the McCord patent in 1990, and filed a second patent infringement complaint against Spectramed in a California federal district court on January 17, 1991 (
Baxter II
).  Spectramed informed Gould of the 
Baxter II
 complaint in June.  Through continuing correspondence, Spectramed updated Gould on the status of both cases and insisted that it was entitled to indemnification from Gould under their Agreement.  Gould continued to deny any basis for liability.  Gould's counsel stated, however, that in the event liability was established, Gould was "concerned not only about the manner in which the litigation has been controlled, but also that Gould Inc. may have been foreclosed on any settlement opportunities without knowledge thereof."

In the 
Baxter II
 litigation, the federal jury favored Baxter, finding that Spectramed's transducers infringed the McCord patent.  The court thereafter issued a permanent injunction barring Spectramed's further manufacture or sale of the infringing transducers.  Spectramed appealed.  Following the appellate court's remand of the case in 
Baxter I
 and during the appeal of 
Baxter II
, on January 11, 1996, Baxter and Spectramed settled all the patent infringement claims, which required Spectramed to make an initial payment of $15 million, and pay two million dollars per year for the next three years, plus royalties at the rate of six and one-half percent of the net sales price of transducers sold in the United States.

In July 1992, after Gould repeatedly refused to participate in the Baxter litigation, Spectramed filed the instant declaratory action in the circuit court.  Count I sought damages for costs expended in the Wallace patent infringement case; count II asserted a claim for expenses incurred to defend against the McCord patent; and count III alleged that Gould was estopped from relying upon section 6.05 of the Agreement in denying liability.

After several years of discovery, Spectramed moved for summary judgment, asserting that Gould was liable pursuant to section 2.04(b) of the Agreement, and sought damages in the amount of $22.9 million.  Gould also moved for summary judgment pursuant to Agreement sections 2.04(b) and 4.07, which contained several warranties.  In its response, Spectramed also sought a summary determination of the liability issue under section 4.07, alleging that Gould breached at least one of the warranties contained in that section.

Following oral argument, the circuit court ruled that there were no triable issues of fact; found that Agreement section 6.05 limited the scope of Gould's indemnity obligations; with respect to patent infringement issues, held that section 2.04(b) was a general causal provision; and concluded that Agreement section 6.05 took precedence over section 2.04(b), interpreting section 6.05 to provide that "the seller would not be liable for damages accruing to the buyer from infringements once the buyer receives notice of those infringements."  The court ruled that because Spectramed's liability in both cases was limited to infringements that occurred after receiving notice, Gould was not liable to Spectramed pursuant to section 6.05.  Further, even if section 2.04(b) applied, the court found no pre-closing event establishing liability for either patent, because liability under the Wallace patent commenced after the issuance of the 1988 reexamination certificate, and liability for infringing the McCord patent commenced on June 17, 1987, after Spectramed received notice of the patent, and after the closing. The court lastly determined that there was no basis for an estoppel claim.  

Accordingly, the circuit court denied Spectramed's summary judgment motion and granted summary judgment in favor of Gould.  Spectramed appeals. 

Summary judgment will be granted when the pleadings, depositions, exhibits, and affidavits on file reveal no genuine issue of material fact and establish that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-

1005 (West 1994); 
Mobil Oil Corp. v. Maryland Casualty Co.
, 288 Ill. App. 3d 743, 751, 681 N.E.2d 552 (1997).  All evidence must be construed in the light most favorable to the nonmoving party, and most strictly against the moving party.  
Gatlin v. Ruder
, 137 Ill. 2d 284, 293, 560 N.E.2d 586 (1990).  Because summary judgment is a drastic remedy, it will be granted only if the right of the moving party is clear and free from doubt.  
McCullough v. Gallaher & Speck
, 254 Ill. App. 3d 941, 948, 627 N.E.2d 202 (1993). Appellate review of orders granting summary judgment motions is 
de novo
.  
Zoeller v. Augustine
, 271 Ill. App. 3d 370, 374, 648 N.E.2d 939 (1995). 

I

Spectramed argues that it was entitled to recover the costs of defending and then settling the two patent infringement claims under section 2.04(b) of the Agreement.  The primary objective in construing a contract is to give effect to the intent of the parties, which is to be ascertained from the language of the contract.  
Omnitrus Merging Corp. v. Illinois Tool Works
, 256 Ill. App. 3d 31, 34, 628 N.E.2d 1165 (1993).  If the contract is clear and unambiguous, the intent of the parties must be determined solely from the contract's plain language, and the court may not consider extrinsic evidence outside the "four corners" of the document.  
Omnitrus
, 256 Ill. App. 3d at 34.  When interpreting a contract, the court must consider the entire document, not merely an isolated portion.  
In re Estate of Chaitlen
, 179 Ill. App. 3d 287, 291, 534 N.E.2d 482 (1989).  Where no ambiguity exists, construction of the document is a question of law.  
Farm Credit Bank v. Whitlock
, 144 Ill. 2d 440, 447, 581 N.E.2d 664 (1991).

Section 2.04(b) of the Agreement reads as follows:

"Except as specifically provided in this Agreement, the Designated Purchasers [Spectramed] shall not assume or pay 
any debt, obligation or liability of any kind or nature
 *** (ii) arising out of a claim made or a suit brought with respect to an event occurring on or before the Closing Date. ***  
Sellers [Gould] shall retain liability for and defend, at their own expense, all such claims regardless of when they are asserted
 ***."  (Emphasis added.)

Among the issues raised by this provision are whether the phrase "[e]xcept as specifically provided in this Agreement" negates the applicability of section 2.04(b) by virtue of section 6.05, which addresses the scope of Gould's liability with regard to indemnification of patent infringement claims; and, second, what action constitutes an "event" occurring on or before the closing date, which would trigger Gould's liability, regardless of when such claims are asserted.

With respect to the first issue, Gould contends that section 6.05, not section 2.04(b), controls the present case.  Section 6.05 contains a limitation on the general indemnification provision with respect to patent infringement suits, as follows:

"An indemnified party shall not be entitled to assert any right of indemnification for any loss, damage or expense suffered by it more than 24 months subsequent to the Closing, except (a) for claims based upon *** patent or trademark infringements, which may be asserted up to six months following the expiration of the applicable statute of limitations, including extensions thereof[.]  An indemnified party shall not be entitled to indemnification hereunder until the aggregate losses, damages or expenses suffered by it exceed $500,000 ("Threshold"), whereupon the indemnified party shall be entitled to indemnification hereunder by the indemnifying party for any loss, damage or expense in excess of the Threshold; provided that no Designated Purchaser shall be entitled to indemnification hereunder for any loss, damage or expense suffered by it for patent or trademark infringements which relate to any period subsequent to its receipt of written notice of an alleged infringement from the party claiming such infringement.  
Notwithstanding the foregoing, this Section 6.05 shall in no way limit or diminish the obligations of Gould and Sellers under Section[] 2.04(b)
."  (Emphasis added.)

The plain language of both sections 6.05 and 2.04(b) clearly contemplates the applicability of section 2.04(b) to patent infringement claims.  Section 6.05 explicitly states that it should not be interpreted to conflict with or limit the application of section 2.04(b).  Therefore, the circuit court erred in applying rules of construction and holding that section 6.05 took precedence over section 2.04(b).  

A court may resort to rules of construction where language is ambiguous; however, an ambiguity exists only if the contract is reasonably susceptible to different constructions, not merely where the parties disagree on the proper construction.  
Chaitlen
, 179 Ill. App. 3d at 291.  Here, the qualifying language contained in the two provisions - "Except as specifically provided in this Agreement" and "this Section 6.05 shall in no way limit or diminish the obligations of Gould and Sellers under Section[] 2.04(b)" - evidences a clear intent that both sections must be read together, in harmony.  Therefore, the rule advanced by Gould, that "where both a general and a specific provision *** address the same subject, the more specific clause controls" (
Grevas v. U.S. Fidelity & Guaranty Co.
, 152 Ill. 2d 407, 411, 604 N.E.2d 942 (1992)), is inapplicable here, where the more specific provision was not intended to limit the scope of the general provision.  The circuit court erred in the instant case by applying rules of construction.

The next question becomes what action will constitute an "event" under section 2.04(b).  Gould insists that consideration of that provision in the context of section 6.05 demonstrates an intent for written notice of the alleged infringement to constitute the "event."  Spectramed contends, however, that Gould's use of infringing features in its transducers prior to the closing date should be considered "events" triggering liability.  A review of both provisions, in conjunction with federal patent law, leads to the conclusion that the "event" giving rise to liability was the manufacture and distribution of the transducers containing the features previously patented by others.

Under federal patent law, "infringement" occurs when "whoever without authority 
makes, uses or sells
 any patented invention, within the United States during the term of the patent therefor."  35 U.S.C.A. sec. 271(a) (Supp. 1997) (Emphasis added).  It is, therefore, 
the actual manufacture, use or sale
 of the offending product which infringes the patent.  Nevertheless, despite the infringement, the owner of a patented product may not claim damages for infringement until after giving notice of the patent.  One way of issuing notice to the public is by identifying the patent on the product; if the product is not marked, the patent owner may not recover damages for the infringement absent evidence "that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice."  35 U.S.C.A. sec. 287(a) (Supp. 1997) (entitled "Limitation of Damages").  Knowledge of a patent's existence or ownership is insufficient to establish notice; "[a]ctual notice requires the affirmative communication of a specific charge of infringement."  
Amsted Industries v. Buckeye Steel Castings Co.
, 24 F. 3d 178, 187 (Fed. Cir. 1994).  

Both sections 2.04(b) and 6.05 are consistent with federal patent law's scheme of recovery for infringement claims.  In patent law, a claim is made or a suit is brought with respect to the actual infringement of a previously patented product.  Concomitantly, section 2.04(b) of the Agreement establishes that Spectramed shall not be liable for "a claim made or a suit brought with respect to an event occurring on or before the Closing Date"; logically, a patent "claim" or "suit" would be brought with respect to the 
actual infringement (the manufacture, use or sale
) of the product and not simply the notice.  See, 
e.g., Maxwell v. J. Baker, Inc.
, 805 F. Supp. 728 (D. Minn. 1992) (notice occurred as of date that complaint was filed where patent holder failed to allege that notice was given to alleged infringer at any time prior to filing of infringement claim).  It is 
not the notice
 that gives rise to the cause of action, or claim, 
but the infringement
 which does; notice is the equitable measure by which damages are ascertained.

Recoverable damages, however, cannot commence before the date of notice to the infringer.  35 U.S.C.A. sec. 287(a) (Supp. 1997).  Mirroring patent law, section 6.05 of the Agreement states that Gould will not bear any damages or losses for patent infringements "which relate to any period subsequent" to written notice of the alleged infringement.  In simple terms, Gould must indemnify Spectramed for infringements that occur before the closing date; Gould, however, will not be liable for damages stemming from the infringement for the period subsequent to Spectramed's receipt of notice of the infringement.

In this case, the parties do not dispute that the McCord patent was issued on September 10, 1985.  Evidence in the record further establishes that the Gould product containing the patented components was not marked.  Further, the June 1987 letter informing Spectramed of the McCord patent constituted notice of the infringement.  Thus, in
 Baxter II
, Spectramed was held liable for infringement damages as to the McCord patent only for the period after receiving notice.  The fact that the patent was issued and in existence in 1985, after which Gould's product infringed that patent, established a "claim" for infringement and therefore constituted an "event" from which a claim could be made or a suit brought, pursuant to section 2.04(b).  Accordingly, Gould must indemnify Spectramed for expenses incurred as a result of defending the suit brought regarding the McCord patent.  Pursuant to section 6.05, however, Gould is not liable for actual infringement damages incurred by Spectramed after Spectramed's receipt of notice.  See 35 U.S.C.A. sec. 287(a) (Supp. 1997).  

Notice of the Wallace patent, issued on September 9, 1986, was received on October 3, 1986, one week before the closing.  In 
Baxter I
, Spectramed was found liable for infringing the patent during the period after the issuance of the 1988 reexamination certificate. The fact that Spectramed ultimately was successful in avoiding liability for the period preceding the issuance of the reexamination certificate, however, did not relieve Gould of its section 2.04(b) obligation to "pay any debt, obligation or liability" arising from "a claim made or a suit brought" before the closing date, here, the legal expenses incurred by Spectramed in challenging that claim.

Gould was not liable, however, for infringement damages after the reexamination certificate was issued.  During reexamination proceedings, the patent owner may amend its patent claim and propose new claims.  35 U.S.C. sec. 305 (1984).  When a patent owner amends its claims, "[t]he original claims are dead" (unless it is identical to the amended claim), and "an infringer's liability commences only from the date the reissue patent is issued."  
Seattle Box Co. v. Industrial Crating & Packing Inc.
, 731 F. 2d 818, 827 (Fed. Cir. 1984).  See also 
Fortel Corp. v. Phone-Mate, Inc.
, 825 F. 2d 1577, 1580 (Fed. Cir. 1987) (quoting 
Seattle Box
).  

Spectramed claims the law regarding reexamination was new and unclear at the time it entered into the Asset Purchase Agreement, and should not be controlling in this case.  These rules of law, however, were in effect at the time of the closing.  Statutes and laws in existence at the time a contract is executed are considered part of the contract; it is presumed that the parties contracted with the knowledge of existing law.  
Braye v. Archer-Daniels-Midland Co.
, 175 Ill. 2d 201, 217, 676 N.E.2d 1295 (1997).  

The portion of the reexamination certificate listing the amended claims, which were different from the original claims, and which Spectramed was accused of infringing in 
Baxter I
, established a new claim for infringement by the patent owner and eviscerated the previous claims in the 1986 patent.  The
 1988 certificate served as notice of the new infringement claim.  Although Gould was responsible for indemnification regarding Spectramed's legal defense of both the 1986 and 1988 claims pursuant to section 2.04(b), it was not liable for infringement damages incurred by Spectramed after the issuance of the 1988 Wallace certificate.

Spectramed argues that it should not be penalized for electing to pursue an administrative proceeding instead of suing the patent owner in federal court, where there would be no opportunity to amend the patent claims.  Spectramed, however, chose the legal forum for its dispute after receiving advice from two separate patent law firms, with full knowledge of the terms of the Agreement, the potential for amending patent claims in reexamination proceedings, and the legal consequences of the amendments.  It cannot now argue that it should be rescued from the consequences of its decision.

Gould next contends that Spectramed cannot recover under section 2.04(b) because it failed to notify Gould promptly when it received notice of the patent infringement claims.  The prompt notification requirement can be found in section 6.03 of the Agreement, which pertains to the Agreement's indemnification provisions, not section 2.04(b).  Moreover, the delays in giving notice were not unreasonable, and Gould was not prejudiced by the timing of Spectramed's notification.  Spectramed informed Gould of a potential claim under the Wallace patent before taking any decisive action other than seeking legal advice and meeting with the patent's owners to determine if further action was necessary.  Spectramed also informed Gould almost immediately after receiving the 
Baxter I
 complaint, and before it was required to file its answer.  Spectramed further notified Gould of the filing of the 
Baxter II
 complaint before taking action.  Gould repeatedly declined to participate in these proceedings.  

Lastly, Gould insists that Spectramed waived reliance on section 2.04 by failing to mention that provision in its correspondence with Gould, and should be estopped from raising that issue in this case.  Gould's argument must fail in light of evidence that Spectramed notified Gould of the pending claims numerous times, repeatedly asserted that Gould was responsible under the Agreement to defend the Baxter claims and resulting damages, and referenced the Agreement when communicating with Gould.

II

Spectramed next argues that Gould was liable as a matter of law for breaching the following warranties, found in section 4.07 of the Agreement:  (1) Gould 
owned or had the right
 "to use without payment to or interference from any other party all inventions, processes, know-how, formulae, trade secrets, [and] patents ***"; (2) "no other inventions, processes, know-how, formulae, trade secrets, [or] patents *** are necessary for the conduct of the business of" Spectramed; (3) "[s]uch inventions, processes, know-how, formulae, trade secrets, [and] patents *** are not currently being challenged in any way and are not involved in any pending (or, to the knowledge of Gould, threatened) interference or opposition action or proceeding and do not *** infringe upon or conflict with any patent ***."

In contrast to sections 2.04(b) and 6.05 of the Agreement, the language of section 4.07 does not limit the applicability of the provisions to circumstances existing at the time of closing.  It is unclear, however, whether the parties intended for Gould to be liable under section 4.07 for warranty breaches that occurred after the closing date of the Agreement.  Evidence in the record, including the correspondence between Spectramed and Gould, further present genuine issues of material fact regarding the scope of Gould's liability under section 4.07, making entry of summary judgment improper.

Gould contends that Spectramed cannot recover for breach of warranty, citing Hillier's receipt of the October 3, 1996, letter from Utah Med regarding the Wallace patent.  Gould asserts that because Spectramed, through Hillier, received notice of the potential patent infringement claim before the closing, Spectramed cannot prove that it relied upon section 4.07.  A party's knowledge of a contract's deficiencies may result in waiver of the contract's warranties.  
Harrington v. Kay
, 136 Ill. App. 3d 561, 483 N.E.2d 560 (1985).  The law therefore requires that parties prove they actually relied on the warranty provisions, but does not require proof that such reliance was reasonable.  
Regopoulos v. Waukegan Partnership
, 240 Ill. App. 3d 668, 674, 608 N.E.2d 457 (1992).  

In the present case, evidence in the record establishes that the Wallace letter was addressed to Hillier in his capacity as a Gould officer, although Hillier also was working on behalf of Spectramed at that time.  Hillier was not involved in the contract negotiations with Gould and, although there is evidence that he mentioned the letter to Aplin, the record is silent as to whether Aplin knew of the letter before negotiating the closing.  Even if Aplin did know of the letter, it is unclear whether, at the time of closing, he knew the letter provided the basis for asserting an infringement claim.  The facts presented raise questions for the trier of fact regarding whether Spectramed actually relied on the warranties at the time of closing, which are not amenable to summary judgment.

Gould further contends that Spectramed is precluded from recovery because it failed to mitigate its damages, as required by section 6.05 of the Agreement, and waived some of its arguments pertaining to section 4.07 by failing to timely raise those claims, also required by section 6.05.  As previously shown, section 6.05 limits the scope of the indemnity provision found in section 6.01.  Section 6.05 does not apply to breach of warranty claims in addition to indemnity claims, nor does language elsewhere in the Agreement provide for such warranty limitation.  Section 6.05, therefore, does not preclude Spectramed from raising a breach of warranty claim.

III

Lastly, Spectramed asserts that the circuit court erred in granting summary judgment on its estoppel claim.  Spectramed argued before the circuit court that two letters written by Gould and Spectramed modified the original terms of the Agreement.

Spectramed based this claim on Gould's February 5, 1987 letter, responding to Spectramed's claim that Gould was responsible for Spectramed's defense to allegations of patent infringement by the owner of the Wallace patent.  In a December 1986 letter sent to Gould, Spectramed notified Gould of the patent infringement claim pursuant to section 6.03 of the Agreement.  Spectramed further stated:  

"At the present time, in order to mitigate whatever losses, damages and expenses which there may be, if any, Spectramed, Inc. intends to continue to manufacture and sell the products containing the alleged infringing features.  However, under Section 6.05 of the Asset Purchase Agreement, there is a provision which limits the ability of Spectramed, Inc. to recover any losses, damages or expenses incurred after receipt of a notice of infringement.  Since the mitigation which would result from continuing to manufacture would inure to the benefit of Gould Inc., Spectramed, Inc. believes that Gould Inc. should also bear whatever losses, damages or expenses that may be incurred after receipt of the Notice.  If Gould Inc. believes to the contrary, Gould Inc. should immediately notify Spectramed, Inc."

Gould responded to this letter by asserting:

"While, we agree with your interpretation of Section 6.05 of the Asset Purchase Agreement in respect to Spectramed's continued manufacture and sale of certain Spectramed products existing as of October 10, 1986 ***, we do not agree that such interpretation would apply to any modification of these products (or any new products) which might also be charged to be an infringement of the [Wallace patent]."

The Spectramed letter expresses its intent to continue to sell the transducers despite the potential infringement claim under the Wallace patent, in an attempt to mitigate its potential damages.  The letter also acknowledges the section 6.05 indemnification limitation, and seeks Gould's agreement to a modification of the Agreement in which Gould would accept liability for future losses, as any mitigation of damages would benefit both parties.  In its response, Gould expresses its agreement with portions of Spectramed's letter, but states that it would not agree to the continued sale of transducers that were modified after the closing.

The parties' modification of the Agreement renders Gould liable for post-

notice damages resulting from infringement of the 1986 Wallace patent.  Gould argues that the patent was not infringed, and therefore, there were no infringement damages to charge to Gould.  Gould further asserts that the damages paid by Spectramed resulted from the infringement of the patent that was issued in 1988 as a consequence of the reexamination proceedings.  Notwithstanding Gould's assertion that it did not agree in the February 5, 1987, letter to be liable for any damages resulting from the issuance of the second Wallace patent or the McCord patent, Gould's interpretation of its own letter strains logic.  Gould's letter clearly evinces its concurrence with Spectramed's intent to continue the manufacture and sale of the existing products.  The only caveat to Gould's agreement with Spectramed's plan to mitigate potential damages was that Spectramed's modification of the products would absolve Gould of any liability.  Accordingly, despite section 6.05's limitation on damages after receipt of notice, Gould must indemnify Spectramed for both the litigation expenses in defending the pre-closing claims, but also must indemnify Spectramed for the post-notice infringement damages.

For the foregoing reasons, the circuit court's order granting summary judgment on counts I, II and III of Spectramed's complaint is reversed and remanded for further proceedings in consonance with the views set forth in this opinion.

Reversed and remanded.

HOURIHANE, P.J., and THEIS, J., concurring.