In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2762

TODD W. MUCH, CHARLES A. MARIEN, III
and CERTIFIED INSURANCE CONSULTANTS,
INCORPORATED, an Illinois corporation,

Plaintiffs-Appellees,

v.

PACIFIC MUTUAL LIFE INSURANCE COMPANY,
a California corporation,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 7621--David H. Coar, Judge.

ARGUED SEPTEMBER 14, 2000--DECIDED September 12, 2001

  Before CUDAHY, EASTERBROOK and RIPPLE,
Circuit Judges.

  RIPPLE, Circuit Judge.  Todd W. Much and
Charles A. Marien, III (collectively "the
plaintiffs") and their wholly owned
corporation, Certified Insurance
Consultants, Inc. ("CICI"), brought a
breach-of-contract action against Pacific
Mutual Life Insurance Co. ("Pacific
Mutual"), seeking renewal commissions for
the sale of variable life insurance
policies. Following a bench trial, the
district court entered judgment for the
plaintiffs. For the reasons set forth in
the following opinion, we reverse the
judgment of the district court.

I

BACKGROUND

A.  Facts

1.
  Mr. Much and Mr. Marien are licensed to
sell life insurance in Illinois and are
licensed with the Securities and Exchange
Commission ("SEC") and the National
Association of Securities Dealers
("NASD") to sell securities. Mr. Much

owns all of CICI's shares, and both Mr. Much and Mr. Marien work for CICI.

Pacific Mutual issued a variable life insurance product termed "Pacific Select Exec." ("PSE") beginning in 1988. Variable life insurance is a permanent form of insurance in which the cash value is based on the performance of an underlying pool of securities. To sell variable life insurance products, an individual must be a NASD-registered representative of a broker-dealer licensed with both the SEC and the NASD.

Pacific Mutual itself was not registered as a broker-dealer with either the SEC or the NASD. Pacific Equities Network ("PEN"), a subsidiary of Pacific Mutual, was properly registered as a broker-dealer, and, therefore, Pacific Mutual paid PEN to act as the principal underwriter of the PSE policies.

Pacific Mutual and PEN had a selling agreement with Mutual Service Corporation ("MSC"), a wholly owned subsidiary of PEN and a wholly owned indirect subsidiary of Pacific Mutual. Under the agreement, PSE was sold by NASD-registered representatives of MSC. Pursuant to another agreement among the three entities, Pacific Mutual and PEN acted as "paymaster" for MSC; at MSC's direction, they sent commission checks directly to the MSC-registered representative selling the policies.

More specifically, the flow of commission dollars generally worked as follows. The insured or policyholder first paid premiums to Pacific Mutual. Pacific Mutual then sent the gross commission dollars to PEN, who paid the broker-dealer, who then paid the registered representative. When the broker-dealer was MSC and the registered representative at issue a producer or subproducer of Pacific Mutual, the process changed somewhat, as per the service agreement among the three entities. In that case, the commission dollars did not physically flow to MSC. PEN instead paid the money directly to the registered representative on MSC's behalf, although the money belonged to MSC and the payments were entered in MSC's books and records. For those registered representatives of MSC who were also Pacific Mutual agents, this

arrangement allowed them to receive a higher percentage of commission, because MSC did not retain a percentage of the commission dollars for itself, and to obtain their commission monies more quickly.

As further background, a given insurance policy can generate various forms of commission. First, commissions are earned in the first year the policy is in effect. These commissions are percentages of the target premium, an actuarially determined amount of thousands of insurance policies on which commissions are paid. This commission has two parts, a base amount and a bonus. Second, commissions are earned on premiums paid in year two and beyond in the amount of two percent of all renewal commissions. Third, continuing commissions known as "trails" are paid annually starting in the tenth year the policy is in effect, based on the net asset value of the policy.

2.

In February 1989, the firm Foote, Cone & Belding ("FCB") contacted Mr. Much about purchasing variable life insurance policies, valued at approximately $1 million apiece, for its executives. Mr. Much and Mr. Marien met with Gene Kolasny, Pacific Mutual's branch manager in Chicago, to discuss the possibility of Pacific Mutual's supplying the insurance policies to Mr. Much and Mr. Marien. Kolasny met multiple times with the plaintiffs; Mr. Much, in fact, testified that Mr. Marien and he met with Kolasny four or five times.

In these conversations, Kolasny and the plaintiffs discussed the commissions that the plaintiffs would receive. Kolasny testified at trial that he told the plaintiffs that their commissions would be eighty-five percent of the target premium in the first year of a given policy and two percent of renewal premiums in subsequent years. Mr. Much testified that Kolasny told him that the commissions would consist of eighty-five percent of the first-year commissions, two percent of renewal commissions, and trails based on net asset value.

Kolasny admitted at trial that Mr. Much and he may have discussed vesting during these initial contract talks, but he does

not remember any specific conversations. Vesting of commissions permits an agent to receive renewal commissions on policies that the agent instituted even after the policy owner has terminated the agent. Mr. Much, in contrast, testified as to four different conversations that he had with Kolasny or Evelyn Grant, another Pacific Mutual employee, in which he was assured that his commissions would be vested.

3.

To receive commissions on the PSE policies, the plaintiffs needed to become registered representatives of a broker-dealer that had a PSE selling agreement in force. According to Mr. Much, Kolasny told the plaintiffs in May or June 1989 that, if they used MSC as their conduit, Kolasny and the Chicago office could participate, be paid, and receive credit for the deal. Further, the plaintiffs would be paid a higher rate of commission if they used MSC. Kolasny did not disclose in these discussions that he was a principal with MSC.

The plaintiffs completed the necessary forms to become registered representatives of MSC. Mr. Much testified that "it didn't make any difference to us" and that Mr. Marien and he assumed that what Kolasny told them regarding the necessity of registering with MSC was correct. R.91 at 11. Mr. Much further testified that he viewed the forms more as a licensing requirement for NASD than as an agreement with MSC.

Mr. Much also completed a set of MSC registration materials, signed on June 13, 1989, and received a MSC compliance manual, which he reviewed.

4.

On July 1, 1989, CICI entered into a producer contract with Pacific Mutual. Under its terms, Pacific Mutual agreed to pay CICI compensation for policies sold at the rates set forth in the compensation schedules in effect on the application date of the policies. The contract specifically provided that:

Subject to the conditions of this contract [Pacific] shall pay [CICI] . . . compensation on policies procured under

this contract at the rates set forth in the Compensation Schedules in effect on the application date of the policies to which they relate.

. . .

[CICI] shall be solely responsible for compensating its employees, agents and brokers by commission or otherwise.

. . .

No oral promises or representations shall be binding nor shall this contract be modified except by agreement in writing, executed on behalf of [Pacific Mutual] by a duly authorized officer.

R.26, Ex.2 at 1-2. The contract also contained an integration clause, which indicated as follows:

This contract supercedes all previous contracts and agreements between [CICI] and [Pacific Mutual] made for the procurement of insurance products.

Id. at 2.

   Kolasny testified that the producer contract applied only to nonvariable life insurance sales. Although he said that he would typically inform agents that the contract applies only to nonvariable policies, Kolasny could not recall a con versation where he told Mr. Much and/or Mr. Marien that the contract did not apply to variable life insurance, such as the PSE at issue here.

   The compensation schedule in effect at the time CICI entered into the producer contract with Pacific Mutual, and at the time the PSE policies were sold, made no provision for commissions on PSE policies but emphasized that the policies could only be sold by properly registered representatives. The schedule provided:

V. REGISTERED PRODUCTS

Pacific Mutual reminds Producers that registered products can only be sold by properly licensed Registered Representatives, registered with a NASD member Broker-Dealer that has a Selling Agreement in effect. Compensation to the Producer for registered insurance products will then be in accordance with

the compensation agreement and schedules between the Broker-Dealer and the Producer currently in effect. Pacific Mutual has not and can not grant authority to sell registered products by Producers that do not have the proper SEC, NASD, and state insurance licenses.

R.26, Ex. 110 at 6.

Mr. Much and Mr. Marien also entered into subproducer contracts with CICI on July 1, 1989, that appointed them agents of CICI and subproducers of Pacific Mutual. The plaintiffs had determined that, for tax purposes, CICI, as opposed to them individually, should receive the commissions and pay the business expenses. Mr. Much testified that Mr. Marien and he signed the subproducer agreements because they were told that the agreements were required to shift the commissions. They thought the subproducer agreements were standard operating procedure when individual producers desired to assign their commissions to a corporation.

In November 1989, Mr. Much received a compensation schedule that covered the PSE product. Pursuant to that schedule, Pacific Mutual, in its capacity as PEN's paymaster, would make payment directly to the producer on the condition that the registered representative was affiliated with MSC and that the service agreement among MSC, Pacific Mutual, and PEN remained in effect. That agreement also indicated that "nothing in this provision is to relieve MSC of its overriding obligation to compensate registered representatives or is intended to relieve PEN's obligation to compensate MSC." R.91 at 14. This compensation schedule was in effect at the time the plaintiffs executed the producer contract.

According to Mr. Much, he did not believe that the various compensation schedules applied to him because he had made an agreement with Kolasny that set up a completely different rate of compensation. This belief was buttressed by the fact that the plaintiffs were always paid at the rates Kolasny quoted.

Beginning in mid-1999, the plaintiffs sold 206 PSE policies to senior executives at FCB. Mr. Much testified that they "had to do just about

everything" to complete these sales: arrange for physicals, conduct interviews, fly to the East and West coasts regularly for a week at a time, and keep track of the policy's delivery. Id. at 16.

The plaintiffs received their first commission on the PSE policies in January 1990, described by Mr. Much as "very, very sizable." Id. at 17. They were paid by PEN acting as MSC's paymaster pursuant to the paymaster agreement. The plaintiffs continued to receive commissions and renewal commissions from the PSE policies from 1989 to 1992.

In March 1992, however, each of the policyholders under the FCB program directed that a new registered representative be appointed to service their PSE policies. After this change, MSC no longer paid Mr. Much and Mr. Marien renewal commissions on the PSE programs. Pacific Mutual, through PEN, has continued to pay renewal commissions to MSC, who instead pays the commissions to the new registered representatives servicing the FCB program.

B.   District Court Proceedings

1.

The plaintiffs filed a complaint against Pacific Mutual in December 1994, claiming that Pacific Mutual was contractually obligated to pay them renewal commissions on the FCB policies even though they had ceased servicing those policies. Specifically, the plaintiffs argued that they had a vested right to commissions enforceable against Pacific Mutual based upon the CICI producer contract and an oral agreement with Kolasny pursuant to which the plaintiffs' commissions on the PSE policies were to be vested.

Pacific Mutual, in contrast, argued that the plaintiffs have no claim against it. Specifically, (1) the producer contract did not obligate Pacific Mutual to pay any commissions for PSE policies; (2) that contract barred the alleged oral agreement with Kolasny; (3) CICI was legally barred from receiving the commissions; (4) the contracts barred the plaintiffs' direct claims against Pacific Mutual; and (5) the plaintiffs' remedy was to sue MSC under their contract with

MSC.

2.

After a bench trial, the district court found in favor of the plaintiffs. The court concluded that Kolasny, acting under apparent authority from Pacific Mutual, entered into a contract with the plaintiffs to pay renewal commissions and trails on the PSE policies the plaintiffs sold to FCB.

The court first noted that two possible contractual bases existed for the plaintiffs' claim: Kolasny's oral promises and the Pacific Mutual producer contract. The court accepted Pacific Mutual's argument that the producer contract provided that any oral promises were superceded and not binding, pointing to language in part IV of the producer contract. The court also pointed out, however, that part III.A.2 of the contract gave Pacific Mutual the right to "set the compensation on plans not included in the Compensation Schedules which are now or may hereafter be issued by" Pacific Mutual. R.91 at 23. This language, the court concluded, permitted Pacific Mutual to set rates for plans outside of Pacific Mutual's compensation schedules via extracontractual means.

Turning to the extracontractual means at issue, the district court determined that Kolasny's oral dealings with the plaintiffs formed a contract. The court found that Kolasny had either actual or apparent authority to form a contract. It also found credible Mr. Much's testimony that Kolasny and the plaintiffs agreed to compensation rates, including the vesting of renewal commissions and trails, when the contract was made. Thus, the court concluded, "if the agreement between Kolasny and Plaintiffs as to compensation is valid despite its oral nature, [Pacific Mutual] is liable for breaching that agreement." Id. at 25.

To assess the validity of the oral contract, the court analyzed two contractual clauses in the producer contract. The first, part III.A.2, indicated to the court that (1) Pacific Mutual retained the right to set compensation in forms other than written compensation schedules; (2) written changes were required in only one circumstance--when Pacific Mutual changed

(as opposed to set) compensation on a plan; and (3) no agreement was necessary to set compensation--in fact, Pacific Mutual could unilaterally change compensation with written notice.

The second clause, part IV.1, explained that no "oral promises or representations shall be binding nor shall this contract be modified except by agreement in writing, executed on behalf of [Pacific Mutual] by a duly authorized officer." Id. at 26. The district court noted that this requirement of a writing conflicted with part III.A.2 which created an extracontractual means of setting compensation. By reserving to Pacific Mutual the right to set compensation in ways other than in a written agreement, the court found, part III.A.2 established a compensation structure outside the general parameters of the producer contract. This structure was, "by its very terms, not limited to the means of written agreements to alter the contractual relationship." Id. Thus, the court concluded, Pacific Mutual could (and, in this case, did) use other means to set compensation, including the oral Kolasny agreement.

Finally, the district court rejected Pacific Mutual's arguments that the plaintiffs should have sued MSC. There was no evidence of a contract between the plaintiffs and MSC under which MSC was responsible for paying the plaintiffs. The forms signed by the plaintiffs dealt only with NASD licensing matters. Moreover, the court noted that the payments through MSC were in name only. MSC never held the commission funds, did not calculate the commissions, and did not write the checks. MSC received no payment for being the broker-dealer. MSC simply acted as a shell, the court concluded, to satisfy the formal requirements of the SEC and NASD.

II

ANALYSIS

A.  Standard of Review

Because this case comes to us after a full bench trial, we review the district court's conclusions of law de novo and its findings of fact for clear error. See NRC Corp. v. Amoco Oil Co., 205 F.3d

1007, 1011 (7th Cir. 2000). Federal jurisdiction is based on diversity of citizenship; therefore, the substantive rights of the parties are governed by state law--in this case, the law of Illinois. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087, 1090 (7th Cir. 1999). It is our duty to apply the law that we believe the Supreme Court of Illinois would apply if the case were before that tribunal rather than this court. See Brunswick Leasing Corp. v. Wis. Cent., Ltd., 136 F.3d 521, 527 (7th Cir. 1998). When the "state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." Lexington, 165 F.3d at 1090.

B.  Interpretation of Contract

   The parties dispute on appeal what agreements govern their contractual relationship and, specifically, the vesting of commissions. Pacific Mutual contends that the written producer and subproducer agreements are the sole authority, while the plaintiffs argue that the oral agreement with Kolasny controls.

   We agree with Pacific Mutual that the written documentation governs the contractual relationship between the parties. Our analysis begins "with the language of the contract itself." Emergency Med. Care, Inc. v. Marion Mem'l Hosp., 94 F.3d 1059, 1060-61 (7th Cir. 1996) (interpreting Illinois law). If the language unambiguously answers the question at issue, the inquiry is over. See id. In such a case, the intent of the parties must be determined solely from the contract's plain language, and extrinsic evidence outside the "four corners" of the document may not be considered. See Omnitrus Merging Corp. v. Ill. Tool Works, Inc., 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1993). Where no ambiguity exists, construction of the contract is a question of law. See Spectramed Inc. v. Gould Inc., 710 N.E.2d 1, 6 (Ill. App. Ct. 1998).

   In our view, the producer contract at issue here is unambiguous. More precisely, several unambiguous provisions

in the contract require a ruling in Pacific Mutual's favor. First, the contract contains an integration clause, which states that "[t]his contract supercedes all previous contracts and agreements between [CICI and Pacific Mutual] made for the procurement of insurance products." R.26, Ex.2 at 2. The Illinois Supreme Court has held that when "parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 885 (Ill. 1999). An integration clause is a "clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement. . . . [The plaintiff] was free to negotiate a contract omitting the integration clause. It did not, and it is bound by its bargain." Id. at 886; see also Owens v. McDermott, Will & Emery, 736 N.E.2d 145, 152 (Ill. App. Ct. 2000) (explaining that the presence of an integration clause is "significant because it clearly indicates the parties' desire that the agreement be interpreted solely according to its own language")./1

Second, the compensation schedule in effect at the time CICI entered into the producer contract with Pacific Mutual, and at the time the PSE policies were sold, emphasized that compensation was to be paid in accordance with the agreement between the plaintiffs and MSC./2 In pertinent part, that document states the following:

Pacific Mutual reminds Producers that registered products can only be sold by properly licensed Registered Representatives, registered with a NASD member Broker-Dealer that has a Selling Agreement in effect. Compensation to the Producer for registered insurance products will then be in accordance with the compensation agreement and schedules between the Broker-Dealer and the Producer currently in effect. Pacific Mutual has not and can not grant authority to sell registered products by Producers that do not have the proper SEC, NASD, and state insurance licenses.

R.26, Ex.110 at 6.

The integration clause states that the contract is inclusive and that everything necessary to interpreting it is contained within that contract and its supporting documentation (the compensation schedule). Looking to the compensation schedule, it provides, as indicated above, that the plaintiffs' compensation is to be in "accordance with the compensation agreement and schedules between the Broker-Dealer [MSC] and the Producer [CICI] currently in effect." Thus, the contract, which has been rendered inclusive by the integration clause, instructs the plaintiffs to look to their agreement with the broker-dealer, MSC, for their compensation and not to their agreement with Pacific Mutual.

The district court noted that the contract provides that Pacific Mutual retained "the right . . . to set the compensation on plans not included in the Compensation Schedules which are now or may hereinafter be issued by [Pacific Mutual]." R.91 at 23. The court believed that this language permitted Pacific Mutual to fix compensation outside the schedules created by Pacific Mutual and that Kolasny had the actual or apparent authority to set compensation in such a fashion. We find ourselves in respectful disagreement with the district court on this issue. Given (1) the explicit mention in the existing compensation schedule that compensation for registered insurance products was to be in accordance with the compensation agreement and schedules between the broker-dealer and the producer "currently in effect" and (2) the explicit warning in the same provision that registered products only can be sold by properly li censed representatives registered with a NASD member broker-dealer, the plaintiffs cannot rely reasonably on the contractual provision that gives Pacific Mutual authority to fix compensation schedules for the plans later issued by Pacific Mutual. Pacific Mutual simply was not licensed to sell this sort of plan.

Conclusion

Pacific Mutual is not obligated to pay the plaintiffs the disputed commissions on the insurance policies that they originally sold to the FCB executives.

Under the unambiguous terms of the contract, the plaintiffs must look to their agreement with MSC for the terms of their compensation. Kolasny's verbal commitment on behalf of Pacific Mutual is not binding on MSC./3

Accordingly, the judgment of the district court is reversed.

REVERSED

FOOTNOTES

/1 The contract also contains a no-oral-modification clause, which provides that "[n]o oral promises or representations shall be binding nor shall this contract be modified except by agreement in writing, executed on behalf of [Pacific Mutual] by a duly authorized officer." R.26, Ex.2 at 2. Although the terms of a written contract can be modified by a subsequent oral agreement even though the contract precludes oral modifications, see Tadros v. Kuzmak, 660 N.E.2d 162, 170 (Ill. App. Ct. 1995), the alleged oral agreement in this case occurred prior to the signing of the contract.

/2 The contract itself refers the plaintiffs to the compensation schedule to determine compensation. The contract states:

Subject to the conditions of this contract, [Pacific Mutual] shall pay . . . compensation on policies procured under this contract at the rates set forth in the Compensation Schedules in effect on the application date of the policies to which they relate.

R.26, Ex.2 at 1.

/3 This resolution of the case makes it unnecessary for us to reach Pacific Mutual's contention that recovery is barred by the Statute of Frauds.