In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-2162 and 98-2314

NRC CORPORATION,

Plaintiff-Appellee, Cross-Appellant,

v.

AMOCO OIL COMPANY,

Defendant-Appellant, Cross-Appellee.

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 93 C 1448--V. Sue Shields, Magistrate Judge.

Argued April 13, 1999--Decided March 9, 2000

Before KANNE, ROVNER and DIANE P. WOOD, Circuit
Judges.

ROVNER, Circuit Judge.  For approximately thirty
years, Amoco leased land from NRC for a gasoline
service station. Near the end of the lease
period, the parties discovered that underground
storage tanks installed by Amoco had leaked,
contaminating the property. Amoco ultimately
agreed to remediate the property. NRC sued Amoco
for damages, and after a bench trial, the court
entered judgment for NRC and against Amoco./1
The court ordered Amoco to pay $528,000.81 for
NRC's loss of use of the property, $13,000 for
NRC's environmental response costs, and NRC's
costs of the suit. The court declined to award
attorney's fees to NRC. Amoco appeals the amount
of the award and NRC cross-appeals the amount of
loss of use damages, the attorney's fees ruling,
and the court's refusal to grant punitive
damages.

I.

NRC owns 35 acres in Hamilton County, Indiana,
at the northwest corner of 96th and Meridian
Streets. In 1959, Amoco leased the very tip of
that large corner property, a .75 acre patch of
land, in order to operate a gasoline service
station. Because of two separate highway projects
completed by the State of Indiana during the
lease period, the parcel was twice reduced in

size through condemnation proceedings, first to .36 acres and then to .327 acres. Amoco renewed the lease several times over the years, with the final lease period ending on March 31, 1989. Amoco ultimately refused to renew the lease because it wanted a larger parcel of land on the same corner so that it could build and operate a more modern service station. NRC refused to lease additional land because it had a master plan for the entire 35 acre parcel that did not include a service station at that location. Up until that time, the rest of the 35 acres was not developed and was used for farming only.

The lease permitted Amoco to install underground storage tanks, and Amoco made use of such tanks throughout the lease period. In December 1986, thirty gallons of gasoline spilled onto the property when the tanks were being filled. Amoco cleaned the spill and reported it to the Indiana Department of Environmental Management ("IDEM"). Shortly thereafter, Amoco installed monitoring wells on the property, and although hydrocarbon odors and gasoline smells were reported at two of the wells, Amoco did not further investigate until approximately two years later. In November 1988, well sampling revealed gasoline odors in one well and three to four inches of "free product" in two other wells./2 Testing done on the well samples was completed in March 1989, and revealed gasoline constituents in four of the six wells. Amoco reported these results to IDEM that same month. A hydrogeologist subsequently recommended that Amoco remove the underground storage tanks and that Amoco subject the property to remediation, a process that would take a minimum of one to three years.

Amoco hired Soil Exploration Services ("SES") to remove six underground storage tanks from the property, five used to store gasoline and one used to store waste oil. SES reported that there was significant free product floating on the water in the tank pit area and removed about 50 gallons from the site at that time. Amoco installed pumps in the tank pit area to remove hydrocarbons once a week. The company also installed more monitoring wells to determine the extent of the hydrocarbon contamination. The contamination detected in these wells was reported to IDEM. In June 1989, NRC asked Amoco to enter into a written agreement to remediate the property, and Amoco did not respond. More wells and additional testing revealed more contamination in October 1989. The Indiana Department of Transportation then asked Amoco to remediate the property and Amoco agreed to do so. In March 1990, Amoco discharged SES from the project and hired Groundwater Technology, Inc. ("GTI") to study the problem. GTI continued the

testing that SES had begun and tried to determine the outer boundaries of the contamination. In November 1990, NRC again sought a formal commitment from Amoco to remediate the property, and Amoco again failed to respond.

In July 1992, after discussions between Amoco and IDEM, and following assorted delays caused by road construction, Amoco provided NRC with a corrective action plan that it had submitted to IDEM nearly a year earlier. Amoco and NRC subsequently reached an agreement to give Amoco access to the property to complete the remediation, and Amoco hired GTI to complete the task. Because of the delays, though, IDEM withdrew its support for the corrective action plan, fined Amoco and required it to submit an updated plan. GTI developed another corrective action plan which IDEM approved in December 1993. After additional testing, Amoco submitted revisions to the plan, and IDEM approved the final corrective action plan in March 1994. The remediation system was installed that same month and at the time of the district court's opinion in April 1998, the system was still operating. Amoco ultimately concluded through testing that the contamination was confined to the leased premises and had not spread to adjacent land or groundwater.

NRC sued Amoco for the loss of the use of the property during the remediation process. After a bench trial, the district court found that the property would not attain its full fair rental value until the cleanup was complete, which was projected at the time of trial to occur in March 2000. The court found that buyers and renters alike had difficulty measuring the risk associated with contaminated property and therefore avoided it. Lenders are similarly loathe to deal with the uncertainties posed by contaminated property, making a sale during remediation even less likely than a lease. The court thus ruled that the property was unmarketable until IDEM approved the corrective action plan, and remediation had actually begun. During the remediation period, the court found, the market demanded a full indemnification agreement, and as of the time of trial no such agreement had been reached between Amoco and NRC, rendering the property unmarketable during that time as well. The highest and best use of the property was as part of a multi-acre tract, according to the district court's findings:

A reasonably sized area that would bear the brunt of the stigma of possible contamination is an area, including the Property, of approximately two acres. Further, even without the threat of contamination outside the Property, a prospective

buyer, tenant, or lender would not consider a two-acre tract that did not include the Property, because it is the Property's corner location with access onto both U.S. 31 and 96th Street that will dictate the highest and best use if rezoning is allowed. Thus, NRC has and will continue to suffer loss of marketability of the two-acre tract until the Property is remediated within approved limits.

NRC Corp. v. Amoco Oil Co., No. IP 93-1448-C, slip op. at 18 (S.D. Ind. April 7, 1998) (internal cite omitted). The court calculated the lease price of the two-acre parcel, and determined that between March 1989 (when the lease terminated) and March 2000 (when remediation was projected to be complete), NRC lost $528,000.81 in rent. Because Amoco agreed in the lease to fully indemnify NRC for any and all damages caused by the operation of the gas station at the site, the court held Amoco liable for that entire amount. The court also held Amoco liable for $13,000 in "response costs," the amount NRC paid to monitor Amoco's compliance with the corrective action plan. After allowing NRC to recover its court costs as well, the trial court declined to award NRC attorneys' fees incurred in the action or punitive damages. Both parties appeal from the district court's judgment.

II.

Amoco challenges the district court's finding that NRC was due damages on any land other than the leased premises. Amoco contends that the district court should have limited the damages to the .327 acre leased parcel because the contamination did not spread beyond that area. Amoco also disputes the award of damages for loss of use, faulting NRC for voluntarily declining to use the property. According to Amoco, the property could have been used for a number of purposes during remediation, and NRC would have recovered significant rent during that period. Finally, Amoco claims the district court erred in awarding damages for the period of time between March 1994 and March 2000, positing that no damages should be awarded once the remediation had begun. NRC cross-appeals the amount of the damage award, contending that the district court undervalued the property in light of the substantial probability that the land would be rezoned to a higher use. NRC also appeals the district court's refusal to grant punitive damages and attorneys' fees.

A.

Both sides agree that Indiana law governs this

dispute. After a bench trial, we review the district court's fact findings with great deference, reversing only for clear error. See Fed. R. Civ. Pro. 52(a); Petrilli v. Drechsel, 94 F.3d 325, 329 (7th Cir. 1996). We review conclusions of law de novo. Petrilli, 94 F.3d at 329. The district court ruled that damages were due for a two-acre parcel encompassing the .327 acres leased, on the theory quoted above, that two acres was the smallest parcel that would bear the brunt of the stigma of contamination, and that no one would lease those two acres without the .327 acre leased parcel which was situated on the very corner of the property. Thus the district court held Amoco liable for damages beyond the leased premises. Amoco characterizes this ruling as both factually and legally incorrect. It is factually incorrect, according to Amoco, because the record was insufficient to support the view that such a two-acre parcel existed and that NRC ever tried to market such a parcel. It is legally incorrect, according to Amoco, because, under Indiana law, stigma damages are limited to the area leased. We will address these claims together because the district court relied on a legal theory that encompasses the alleged factual deficiency.

Amoco asks this Court to rely on the general rule in Indiana that the proper measure of damages for loss of use of property is the fair rental value of that property during the time of the injury. However, the parties bargained for a different measure of damages when they entered into a lease agreement with a broad indemnification clause that held Amoco liable for any damages to NRC arising from the operation of the service station. The district court found that Amoco is liable to NRC for all the damages NRC incurred as a result of the contamination of the site based on an indemnity clause in the lease. The court did not simply rely on the "unitary" nature of the property in awarding damages; nor did the court rely on a theory of stigma created by the contamination. The parties vigorously contest the appropriateness of the application of the unitary property theory or the stigma theory to this case, but the district court relied on something much simpler and more straightforward. The lease contained an indemnification clause that required Amoco to indemnify and "save harmless the Lessor [NRC] from all claims, mechanic liens, damages, demands, actions, costs and charges arising out of or by reason of the . . . operation of the business herein authorized on the premises . . . during the term of this lease." The court found that the plain language of this clause required Amoco to reimburse NRC for any damages caused by the operation of the gas station. The court

concluded that "[t]here is no dispute that the operation of the Amoco station caused contamination on the site, and to the extent that the presence of that contamination caused damages to NRC, Amoco is liable for that damage." NRC Corp., slip op. at 19-20. Nothing in this provision limited Amoco's liability to harm to the leased premises, and the court therefore charged Amoco with liability for all the damage suffered by NRC due to the contamination.

Two of NRC's experts testified that the highest and best use of the leased land was as part of a two-acre parcel on the corner. The .327 leased land provided the only entrance to those 1.673 acres and according to one appraisal expert, "The Amoco site in itself, whatever remains of it, is only important to the appraisal problem in my view because of the fact that it's an integral part of a two-acre site that would be demanded in the market place. It provides the only legal and physical access that we would have to a corner location there off of Meridian and 96th Street." Tr. at 634. As the district court noted, the contamination of the leased parcel affected the surrounding 1.673 acres because no one would lease that space without the road access and visibility provided by the corner-location leased parcel. Thus, when Amoco rendered the leased parcel temporarily unusable, it also eliminated NRC's opportunity to lease or sell the surrounding 1.673 acres. Although the court borrowed language from the unitary theory, a legal theory, in reaching this conclusion, this was really a factual conclusion that Amoco damaged NRC by reducing its opportunities to sell or lease not only the .327 acre leased parcel but also the immediately contiguous land. See United States v. 105.40 Acres of Land, More or Less, in Porter County, Indiana, 471 F.2d 207 (7th Cir. 1972) (applying the unitary theory in the eminent domain context); City of Indianapolis v. Heeter, 355 N.E.2d 429 (Ind. Ct. App. 1976) (same). In those cases, in order to value the condemned property, the courts allowed the land owners to show that the highest and best use of the land was in combination with contiguous and non-contiguous parcels. The courts held that the market value of the condemned parcels should be set by considering the effects of the surrounding land on potential uses. Here, in a mirror-image scenario, the court found that contamination on the leased parcel affected the owner's ability to market surrounding land.

Under the indemnification clause, the court found that Amoco was liable for all damages caused by Amoco's use of the leased land as a service station, not just the damages to the leased parcel itself. Again, although the court

used the word "stigma" in finding that the contamination affected the contiguous parcel, the court did not find that the damages were based on stigma, and the stigma cases are thus inapplicable. See Adams v. Star Enterprise, 51 F.3d 417 (4th Cir. 1995) (land owners could not recover under Virginia law under nuisance or negligence theories for stigma caused by underground oil spill without showing physical impact on owner's property or physical injury); Berry v. Armstrong Rubber Co., 989 F.2d 822 (5th Cir. 1993), cert. denied, 510 U.S. 1117 (1994) (property owners could not establish nuisance, trespass, or stigma action under Mississippi law without evidence of physical damage to the owner's land). The fact that NRC could not prove contamination beyond the boundaries of the leased parcel was irrelevant to the district court's finding that the contamination on that parcel eliminated NRC's ability to sell or lease the surrounding property. The court relied on the indemnification clause and Amoco did not challenge that reliance on appeal. Amoco thus waived any challenge to that theory of damages, and we affirm on that ground alone. United States v. Neely, 980 F.2d 1074, 1082 (7th Cir. 1992) (to preserve an issue for appellate review, a party must alert the district court to the specific grounds for the party's argument).

B.

Amoco also challenges the award of damages because NRC could have been using the property during remediation for any number of uses. Amoco faults NRC for voluntarily declining to market the property. For example, Amoco itself wanted to lease the property to build and run a larger, more modern service station. Amoco also argues that the property could have been used as a parking lot or landscaping while remediation went on just below the surface. The district court took a different view of the evidence, and we reverse the district court's fact findings for clear error only. Petrilli, 94 F.3d at 329. According to the district court's findings, before the corrective action plan was approved, it was impossible for potential buyers, lessees, and lenders to assess the risks associated with the contamination, and thus the property was unmarketable until that time. Even after a corrective action plan is approved and remediation has begun, the district court found that "the market demands a full indemnification agreement in order to make contaminated property marketable." NRC Corp., slip op. at 16. Because the parties had not entered into a formal indemnification agreement (for the post-lease period), the property was unmarketable until remediation was complete. Amoco contends that

there is no support in the record for the proposition that the market demands a full indemnification agreement.

NRC counters with substantial evidence supporting the decreased value of contaminated property, both before and during remediation. For example, Amoco's appraiser agreed that contamination blocks marketability, and that prospective purchasers, developers and lenders will require evidence that the remediation has been completed and approved by IDEM. Experts testified consistently that until the corrective action plan was approved in March 1994, the property was unmarketable. After that time, while the property was undergoing remediation, uncertainty remained. Testimony demonstrated that lenders would be reluctant to get behind the property without guarantees that remediation was working. During the remediation, the progress reports Amoco submitted to IDEM showed fluctuations in contaminant levels. Sometimes levels were lower, but sometimes they were higher, so that during the process there was uncertainty as to the effectiveness of the remediation. The district court did not stretch far in inferring that the market would demand indemnity during this period in order to make the property marketable. Because the district court's finding is supported by the evidence, we find no error.

C.

We now turn to NRC's cross-appeal. NRC complains that the district court undervalued the two-acre parcel. The district court projected revenue for the parcel, setting the value at $3.95 per square foot in 1989, and increasing that amount 5% per year. The court agreed with one expert that the fair market value of a two-acre tract would have been $12.54 per square foot as of March 1989 had there been a change in zoning for the property. The court further found that a "change in zoning is highly probable, and this probability enhances the square foot value of the Property by 20%." NRC Corp., slip op. at 18. NRC urges us to find that if the chance of rezoning was "highly probable," then the court should have valued the land at $12.54 per square foot as of March 1989, with a 5% increase for each subsequent year.

NRC's reasoning is faulty, however. In order for the district court to grant full value for the rezoning, the probability would have to be 100% that the land would be rezoned. Clearly, the court did not agree with this assessment, finding that the high probability was approximately 20%. A "high probability" does not mean 100% or even

more than 50%. It is a subjective term that the district court rendered objective by assigning it a value of 20% under the facts of this case. This is a fact finding, and we reverse the district court's findings of fact for clear error only. NRC fails to convince us that the district court erred in finding that there was less than a 100% probability that the land would be rezoned. We reject NRC's claim for damages for lost opportunity cost for the same reason. The district court's decision was based on fact findings, and lost opportunity cost is an inherently speculative amount that the district court was well within its discretion to reject as an element of damages on these facts.

D.

The district court granted Amoco's motion for judgment on the evidence on NRC's claim for punitive damages at the close of NRC's case-in-chief. The district court found that, even accepting as true all of NRC's allegations of Amoco's conduct, "that still does not rise to the level of conduct that is necessary for punitive damages." Tr. at 836. NRC contends that the trial court relied on USA Life One Ins. Co. of Indiana v. Nuckolls, 682 N.E.2d 534 (Ind. 1997), which was inapplicable. Instead, NRC urges us to find that it should have been allowed to prove punitive damages under Gray v. Westinghouse Electric Corp., 624 N.E.2d 49 (Ind. Ct. App. 1993).

Under Nuckolls, punitive damages may be awarded in a contract case only if the plaintiff pleads and proves an independent tort and only if there is clear and convincing evidence that the defendant acted with "malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." 682 N.E.2d at 541. Gray was a nuisance case, not a contract case, and NRC thus argues that it is more applicable than Nuckolls. Under Gray, punitive damages may be awarded if the plaintiff proves the defendant acted with a quasi-criminal state of mind or wilful and wanton misconduct, which under existing conditions, the defendant knows will result in injury. "Willful and wanton misconduct need not include malice or intent to injure. Further, conduct which is oppressive or amounts to gross negligence justifies punitive damages." 624 N.E.2d at 54-55. Interestingly, Gray cites a breach of contract case for the standard for punitive damages, and we therefore doubt that Gray is good law after the Indiana Supreme Court ruled in Nuckolls. In any case, this was a breach of contract case, and the court awarded damages

under the indemnity clause of the lease contract. The court specifically stated that Amoco's conduct did not rise to the level necessary under Nuckolls, and we will not overturn that finding unless clearly erroneous. Nothing in the record suggests error, and so we affirm the district court's denial of punitive damages.

E.

Finally, we address NRC's claim for attorneys' fees. NRC claims that the same conduct justifying an award of punitive damages justifies an award of attorneys' fees under the indemnification clause. According to NRC, Indiana law allows an indemnitee to recover from the indemnitor the costs of prosecuting the indemnity action, including attorneys' fees. In the district court, NRC sought attorneys' fees under two statutory provisions and under the common law. The district court rejected those theories and NRC does not challenge those rulings on appeal, instead relying on the indemnification agreement as the source of fees. But NRC did not raise that argument below and therefore waived it. Neely, 980 F.2d at 1082. Even had NRC preserved this argument, however, the result would be the same. The indemnity case on which NRC primarily relies was founded on an agreement containing an express provision for attorneys' fees. There is no such express provision in this indemnity agreement, and thus NRC is not entitled to fees under the lease. See Zebrowski & Assoc., Inc. v. City of Indianapolis, 457 N.E.2d 259 (Ind. Ct. App. 1983). We thus affirm the district court's refusal to grant attorneys' fees to NRC.

III.

In sum, the district court did not clearly err in finding Amoco liable under the lease for all of the damages caused by contamination of the leased premises, including damages for NRC's inability to lease or sell the property immediately surrounding the leased parcel. Nor did the district court err in awarding damages for the period of time after remediation had begun, while there was still great uncertainty as to the success of the remediation process. We also affirm the district court's measure of damages for the property, which the court enhanced based on a 20% probability that the land could be rezoned. Finally, we find that the court did not err is refusing to award punitive damages or attorneys' fees.

AFFIRMED.

/1 The parties consented to a trial before a magistrate judge pursuant to 28 U.S.C. sec. 636(c).

/2 "Free product" refers to gasoline and its constituents.