

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-28-2005

# Jaasma v. Shell Oil Co

Precedential or Non-Precedential: Precedential

Docket No. 04-2095

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Jaasma v. Shell Oil Co" (2005). *2005 Decisions.* Paper 905.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/905

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2095

———

ALICE JAASMA; TRUST UNDER LAST WILL AND
TESTAMENT OF RALPH MCEWAN

*Appellants*

v.

SHELL OIL COMPANY, a Delaware Corporation;
MOTIVA ENTERPRISES, LLC.

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 02-CV-4677)
District Judge: Honorable Williams H. Walls

———

Argued April 18, 2005
Before: ROTH, FUENTES, and BECKER, *Circuit Judges*.

(Filed June 28, 2005)

WILLIAM T. SMITH (argued)
ANNE P. WARD
Hook, Smith & Meyer
851 Franklin Lake Road
P.O. Box 128
Franklin Lake, NJ 07417
          *Attorneys for Appellants*

JEFFREY W. MORYAN (argued)

AGNES ANTONIAN
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068
        *Attorneys for Appellees*

---

OPINION OF THE COURT

---

BECKER, *Circuit Judge*.

This is an appeal by plaintiffs Alice Jaasma and the Trust of Ralph McEwan (hereinafter "Jaasma") from an order of the District Court granting judgment as a matter of law against Jaasma pursuant to Fed. R. Civ. P. 50(a), because Jaasma had not established that the defendants, Shell Oil Company (Shell) and its assignee, Motiva Enterprises, LLC (Motiva) had breached their obligations under a lease agreement to operate a gasoline station or that she had suffered cognizable damages as a result.

Motiva ceased operating the gasoline station on Jaasma's property, and terminated the lease on October 31, 2001. However, when Motiva removed the gasoline station's underground storage tanks one week before the termination of the lease, fuel residue was discovered on the adjacent soil, which led to a two-and-a-half year investigation by the New Jersey Department of Environmental Protection (NJDEP). It was not until February 18, 2004, that NJDEP issued a final No Further Action (NFA) letter concluding the investigation. While soil samples taken between October 31, 2001, and February 18, 2004, indicated that the levels of hazardous compounds were in fact below regulatory standards, it took over two years of sampling to prove the safety of the property to the satisfaction of NJDEP.

Jaasma's suit, which alleged that Shell and Motiva breached the lease, sought damages for loss of use during the pendency of the NJDEP investigation. The appeal presents two principal questions. First, is there is a legally sufficient basis for a jury to find that Shell/Motiva breached the lease agreement? We conclude that there is. Second, does New Jersey law recognize loss of use as a measure of damages for temporary harm to

2

property interests as a result of the uncertainty surrounding a property's environmental status which impairs its marketability? The District Court found that New Jersey law limits the measures of damages to only permanent diminution in value and cost of repair or cost of remediation, and therefore does not recognize damages for such temporary harm. We conclude, however, that the loss of use described is a cognizable measure of damages under New Jersey law, and that judgment as a matter of law was therefore inappropriate because there is sufficient evidence of lost use for the case to proceed.

Defendants urge that even if loss of use is cognizable, Jaasma was unreasonable in her mitigation efforts by failing to immediately market the property. However, because the reasonableness of mitigation efforts is generally a question of fact, and because the evidence is sufficient for a jury to find that Jaasma was reasonable in her efforts to market the property, we decline to dispose of this case as a matter of law on the grounds of lack of mitigation.

Finally, we agree with Jaasma that the District Court abused its discretion by excluding the expert testimony of Gary J. DiPippo because the Court's decision was based on a misunderstanding of the purpose of DiPippo's testimony. DiPippo's testimony was relevant to the measure of damages and to the reasonableness of Jaasma's mitigation efforts, and thus the exclusion of his testimony was not harmless error. Therefore, we will reverse the District Court's grant of judgment as a matter of law and the order excluding DiPippo's testimony.

Our review of the District Court's grant of judgment as a matter of law is plenary. *Mosley v. Wilson*, 102 F.3d 85, 89 (3d Cir. 1996). Judgment as a matter of law is warranted only if "there is no legally sufficient evidentiary basis for a reasonable jury to find" in favor of Jaasma. Fed. R. Civ. P. 50(a)(1). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2524 (1971), *quoted in Patzig v. O'Neil*, 577 F.2d 841,

3

846 (3d Cir. 1978).[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jaasma owns a 1.3-acre parcel in West Paterson, New Jersey, which she leased to Shell in 1988. Shell or its franchisees had been operating a gasoline station at this site since 1961, and continued to do so after entering into the lease agreement. On October 31, 1996, Shell exercised an option to extend the lease for an additional five years, and two years later, Shell assigned the remainder of the lease to Motiva. In a July 31, 2001, letter, Motiva stated its intention to leave the property at the end of the lease, which was scheduled to terminate on October 31, 2001.

Jaasma claims, however, that Motiva and Shell failed to return the property to its "original state" as required by the lease terms. Paragraph 20A of the Addendum to the Lease states in pertinent part:

> It is also agreed that all gasoline, waste oil and fuel oil tanks shall be removed from the Premises at the expiration of the Lease by Shell and the Premises restored to its original state.

> Shell shall comply with all applicable environmental laws and shall hold the Lessor harmless and shall indemnify the Lessor against all claims whatsoever arising out of any violation of said laws or any contamination of the subject property by hazardous substances attributable to Shell.

Additionally, Paragraph 20 of the lease states, "At any termination of this Lease or any tenancy thereafter, Shell shall surrender the Premises to Lessor, subject to ordinary wear and tear . . . ."

Jaasma alleges that the property was contaminated by the

---

[1]The District Court exercised diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction over Jaasma's appeal pursuant to 28 U.S.C. § 1291.

gas station's operations during the lease. The environmental problems on the property first began in November 1989, when, during the removal of a 25-year-old waste-oil tank, contaminants were noticed in the adjacent soil. The leak was reported immediately to NJDEP. Between 1990 and 1997, NJDEP required Shell and Motiva to remediate the property and to conduct nearly seven years of sampling of the soil and groundwater to monitor contaminant levels. On January 7, 1997, NJDEP issued a conditional NFA, which stated, "Shell has complied with the existing requirements regarding the remedial investigation and remedial action for the underground storage tank system," but found that levels of contamination remained above the state's Ground Water Quality Standards. As a result, NJDEP required Shell/Motiva to conduct further sampling to ensure that the soil and groundwater control complied with NJDEP regulations and restricted the "use of groundwater as a potable water supply . . . without the proper precautions."

On October 24 and 25, 2001, one week before the end of the lease, Shell/Motiva removed the underground storage tanks, and petroleum discharges were again found in the soil adjacent to the tanks. On January 31, 2002, three months after the lease terminated, Motiva prepared an Underground Storage Tank Closure Remedial Investigation Report, which stated that, while some discharge was apparent, the tanks were structurally intact, they had no holes or cracks, and post-excavation soil samples did not identify any above-level concentrations of regulated compounds. The Remedial Investigation Report also stated that nearly 6,500 tons of soil were removed from the property as part of excavation activities and replaced with clean fill.[2]

Three months later, on April 5, 2002, NJDEP acknowledged

_____

[2]Defendants contend that all environmental remediation efforts were completed by October 31, 2001. Brief for Appellee at 6. However, the Remedial Investigation Report states that the three underground storage tanks were not removed until November 23, 2001, and does not specify when the excavation activities took place. It is therefore unclear from the Remedial Investigation Report when the tank removal and soil excavation were actually completed.

the receipt of Motiva's Remedial Investigation Report. The NJDEP response did not, however, give the property a clean bill of health, but rather identified certain deficiencies that Motiva still needed to address. In particular, NJDEP stated that the soil samples had not been properly prepared and that Motiva needed to resample in accordance with NJDEP requirements and to install new monitoring wells.

Motiva claims that it was delayed in completing this testing because, in June 2003, NJDEP requested that Motiva conduct further groundwater sampling pursuant to the 2003 amendments to state environmental regulations. On September 29, 2003, Motiva submitted the supplemental information requested in NJDEP's April 5, 2002, letter. This report confirmed that the contaminants in the soil and water continued to be below regulated levels. NJDEP issued a final NFA on February 18, 2004, which reported that the groundwater and soil met the applicable environmental standards under N.J.A.C. 7:26E-1.8, and thus, concluded its oversight of the property.

Defendants maintain that soil and water samples have consistently demonstrated that the property was in fact environmentally safe during the period of NJDEP oversight following the termination of the lease. They contend that, between October 31, 2001, and February 18, 2004, NJDEP only requested "additional confirmatory samples," but no further remediation measures were taken or required. Moreover, Defendants have provided records chronicling each sample taken from October 24, 2001 (i.e. before the lease terminated) until July 3, 2003, reflecting that the soil and groundwater contaminants were below regulated levels.

Jaasma does not dispute that contaminant levels in the soil and groundwater were, with 20/20 hindsight, compliant with environmental standards during the period between October 31, 2001, and February 18, 2004. Rather, Jaasma alleges that, due to the ongoing NJDEP review and the uncertainty surrounding the environmental status of the property, she was not able to rent or sell the property at fair market value for the twenty-eight months from the termination of the lease until NJDEP issued the final NFA. Thus the problem, according to Jaasma, was not the actual environmental condition of the property, but her inability to confirm that the property was in compliance with New Jersey's

6

environmental regulations and the corresponding lack of an NFA. Jaasma represents that three different realtors advised that she would not receive fair market value for the property and could not warrant the condition of the property to prospective purchasers without an NFA.

Jaasma alleges that defendants would not communicate about the status of the property for eight months following the termination of the lease, notwithstanding three letters sent to them soliciting information about the removal of the tanks and compliance with environmental laws. Moreover, Jaasma asserts that defendants did not transmit the Tank Closure Report until January 31, 2002, and that she only learned about the ongoing NJDEP investigation of the property on May 10, 2002. Thus, it is Jaasma's position that her use and marketability of the property was hampered by the lack of an NFA and her inability to ascertain the true environmental status of the property from defendants.

Jaasma claims that, as a result, she waited to market the property until May, 2003, when she believed that the issuance of the NFA was "imminent," although in reality the NFA was not issued until nearly a year later. Jaasma acknowledges that she received several offers to purchase the property in the meantime. While the offers to buy the property were not consummated for reasons other than the lack of an NFA, Jaasma points out that each potential buyer specified that an NFA was a precondition of closing, or at least conditioned the transaction on proof that the property was free from contamination.[3]

Jaasma sued defendants in state court alleging in Count I, that defendants failed to vacate the property at the termination of the lease and were holdover tenants; in Count II, that defendants negligently contaminated the property; and in Count III, that defendants breached the lease by failing to return the property to its "original condition." Defendants timely removed the case to the District Court for the District of New Jersey and then moved for summary judgment on all counts. After oral argument, the District

---

[3]At one point, the property was under agreement for $1.5 million—$150,000 above the asking price—but the buyer backed out (in January 2004) for reasons unrelated to the absence of a NFA.

Court granted summary judgment on the holdover tenancy claim (Count I) and the negligence claim (Count II).

Just prior to trial on the breach of lease claim (Count III), the District Court heard oral argument on several motions *in limine*. First, the Court granted defendants' motion to exclude the testimony of Jaasma's expert, Gary J. DiPippo, after determining that his testimony did not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Then, after reviewing the deposition testimony of Jaasma's remaining expert witness, Charles Lanyard, the District Court dismissed the amended complaint, pursuant to Fed. R. Civ. P. 50(a).[4] The Court concluded that Jaasma could not prove damages, and suggested that there was no evidence defendants had breached the lease. The Court stated:

> It is undisputed that the market value of the property has not been [a]ffected. It's unchallenged. What is sought by the plaintiffs by way of demonstration is that in 2003 Mr. Lanyard, who was a real estate salesman working with the brokerage in commercial real estate, sought prospective buyers of that property. And he says they, among other concerns besides the price, was the

---

[4]It was premature for the District Court to have decided this case under Fed. R. Civ. P. 50(a). The Court may grant judgment as a matter of law under Rule 50 if the motion is brought "during a trial by jury" after the non-moving party "has been fully heard on an issue." Fed. R. Civ. P. 50(a). The Court's decision in this case occurred prior to the commencement of trial and prior to the jury being sworn, and thus was not determined "during a trial by jury." We are also not convinced that Jaasma was given the opportunity to be "fully heard" on the issue of damages. *See Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 612 (5th Cir. 2004) (holding that "it is essential that the nonmoving party be permitted to present all of its evidence" prior to the entry of judgment as a matter of law under Rule 50); *Francis v. Clark Equip. Co.,* 993 F.2d 545, 555 (6th Cir. 1993). However, because neither party raises an objection on procedural grounds in this appeal, we will decide this case on the merits notwithstanding our concerns about the procedural posture of the District Court's determination.

property clean or were the[re] environmental conditions that had to be met. And he spoke generally of the need for [an] NFA . . . .

I am constrained, reluctantly but I am constrained to say that's insufficient legally in this circumstance. And the defendant is right in its recitation of the law. The measure of damages would be a diminution of . . . the market value of the property occasioned by whatever might be attributable to the unreasonable actions of the defendant . . . or the cost [of] remediation or the cost of repair[.] [W]e don't have . . . any assertion that the market value has been diminished.

We don't have any assertion as to any cost of remediation visited upon the plaintiff and we don't have any assertion of what any reasonable fact finder could conclude would be an unreasonable delay by Shell in doing what it was supposed to do in regard to enforcing, by enforcing I mean living up to the two paragraphs that I spoke of . . . .

Thus, by limiting the measure of damages to diminution in value or cost of remediation or repair, the District Court implicitly rejected Jaasma's argument, presented during the oral argument on the Rule 50 motion, that New Jersey law recognizes damages due to temporary impairment of the use or marketability of property caused by uncertainty over its environmental status.

## II. BREACH OF THE LEASE AGREEMENT

We must first address the difficult question whether defendants breached the lease agreement. While the District Court relied essentially on the damages issue in granting judgment as a matter of law, the Court also suggested that defendants may not have breached their obligations under the lease.[5] We conclude,

---

[5]A district court exercising diversity jurisdiction must apply the substantive law of the state whose law governs the action. *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1373 n. 15 (3d Cir. 1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78

however, that a jury could reasonably find that defendants violated the lease.

Under New Jersey law, a commercial lease is governed by traditional contract principles, *see Ringwood Assocs. v. Jack's of Rte. 23, Inc.*, 398 A.2d 1315, 1320 (N.J. Super. Ct. App. Div. 1979); *Matter of Barclay Indus., Inc.*, 736 F.2d 75, 78 (3d Cir. 1984), under which "[d]iscerning contractual intent is a question of fact unless the provisions of a contract are 'wholly unambiguous.'" *Id.* at 78 n.3 (citations omitted). Thus, only where the terms are unambiguous is judgment as a matter of law appropriate. *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991). To interpret a contract, courts will consider the "actual words of the agreement themselves, as well as any alternative meanings offered by counsel, and extrinsic evidence offered in support of those alternative meanings," *id.*, reading contract terms in context. *See Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1009 (3d Cir. 1982); Restatement (Second) of Contracts § 202(2) (1981). Additionally, where the contractual language is ambiguous, we may look to the conduct of the parties following the execution of the lease to interpret the ambiguous lease provisions. *See Michaels v. Brookchester, Inc.*, 140 A.2d 199, 204 (N.J. 1958) ("Where ambiguity exists, the subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding.").

There are two phrases in Paragraph 20A of the Addendum to the Lease Agreement that could support Jaasma's claim that Defendants breached their obligations under the lease: first, the lease states that Shell "shall comply with all applicable environmental laws"; and second, the agreement states that the

---

(1938)). "When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue." *Id.* But "[a]bsent a definitive statement of the applicable law by the state's highest court, a district court may also consider the decisions of state intermediate appellate courts in order to facilitate its prediction." *Paolella v. Browning-Ferris, Inc.,* 158 F.3d 183, 189 (3d Cir. 1998).

property shall be returned "to its original state."

Under the lease agreement, it was Shell's responsibility to comply with all applicable environmental laws. The pertinent environmental regulations include both substantive and reporting requirements. Thus, the regulations governing underground storage tanks not only require physical remediation, but also contain a series of sampling and reporting requirements in the wake of a reported discharge of petroleum contaminants. *See* N.J.A.C. 7:26E-1.1 *et seq.* Although there is no explicit obligation for Shell to obtain an NFA or to provide information to Jaasma about the environmental condition of the property after the termination of the lease, we believe that a reasonable factfinder might determine that compliance with "all applicable environmental laws" includes the obligation to produce the evidence and reports necessary for NJDEP to issue an NFA. Evidence of custom and practice in the trade might also support such a finding. *See VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 523 (N.J. 1994) (looking to, *inter alia*, custom and usage as evidence of the parties' intention).

Second, Defendants had a contractual duty to return the property to its "original state." Jaasma argues that this obligation encompasses not only a duty to leave the property free from physical contamination, but also a duty to leave the property in marketable condition. Under this view, even if defendants had successfully remediated the soil and groundwater prior to the termination of the lease agreement, after the contamination was discovered, an NFA was a crucial aspect of returning the property to the "original state" so that the property could be freely marketed for sale or lease.

We need not decide, as an abstract proposition, whether an NFA per se is required; we do however believe that a reasonable fact finder could determine that the duty to return the property to its "original state" encompasses the duty to leave the property free from the kind of impediments that would render it unmarketable.[6] Based on the deposition testimony of Charles Lanyard (who served

---

[6]Obviously, the legal conclusions reached in this part of the opinion are our prediction of what the New Jersey Supreme Court would likely hold. *Orson, Inc.*, 79 F.3d at 1373 n. 15.

11

as both a fact and expert witness for Jaasma), on Jaasma's proffer that three realtors told her that she could not sell the property at market price without an imminent NFA, and on the evidence that prospective buyers made an NFA a precondition for sale, we believe that a factfinder could reasonably find that the property was not fully marketable prior to the issuance of the NFA.[7]

Finally, New Jersey courts have given "great weight" to the parties' course of conduct in discerning the intent of the parties. *See Joseph Hilton & Assoc., Inc. v. Evans,* 492 A.2d 1062, 1070 (N.J. Super. Ct. App. Div. 1985); *Savarese v. Corcoran*, 709 A.2d 829, 832-33 (N.J. Super. Ct. 1997). Where the contract terms are ambiguous, New Jersey courts have been willing to infer contractual duties based on the conduct of the parties. For example, in *Michaels*, 140 A.2d at 200, tenants sued their landlord for failure to repair a cabinet door's hinge, which gave way, injuring one of the tenants. The New Jersey Supreme Court found that the lease "contain[ed] no clearcut promise by the tenant or landlord with respect to repair of the defect[ive cabinet door] . . . ." *Id.* at 204. Nevertheless, the court found that "[w]hen we look to the actual performance of the parties, we find conduct which persuasively justifies the conclusion that the parties did intend by the writing that the landlord make repairs" because the landlord generally furnished a maintenance crew, had made repairs on prior occasions in response to tenants' calls, and "readily agreed to repair the cabinet door" when asked. *Id.* at 205-06.

The parties' course of conduct in this case supports the view

---

[7]At his deposition, Lanyard was asked whether the property would be unmarketable if the contamination was removed before the tenant left the site and all that remained was ongoing testing. Lanyard testified, "Once there is a no further action [letter], [potential buyers] know—they feel they can proceed without a problem. But if there is [sic] some other concerns or some monitoring problems that might occur or future question as to . . . whether or not they can build on the property, it's going to come up; the issue will, in fact, be raised." Even if the property could be built upon immediately, Lanyard stated, "somebody would have a higher comfort level. But I'm sure that . . . they would still look for the final cleanup, especially on buy situation . . . ."

12

that it was defendants' obligation under the lease not only to clean up the property, but also to engage in the sampling and reporting necessary to obtain an NFA and to restore the property to fully marketable status. Jaasma has adduced evidence which shows that, following the first spill in 1989, defendants took full responsibility for dealing with NJDEP regulatory procedures by conducting all of the physical remediation, and by taking the necessary samples, submitting the data, and handling the regulatory processes in order to obtain a conditional NFA. Moreover, as in *Michaels*, during the events which gave rise to this litigation, defendants have apparently never disputed that they were responsible for obtaining an NFA and they have in fact done so. The parties' course of dealing thus further justifies submitting the breach element to the jury.

In sum, given the varying interpretations offered by Jaasma and defendants of the contractual language, *see St. Paul Fire & Marine Ins.*, 935 F.2d at 1431 (looking to "alternative meanings offered by counsel" to discern contractual intent), we cannot say that the lease is "wholly unambiguous" as to defendants' contractual duties. And we conclude that the language of the lease and the parties' course of dealing present a jury question whether defendants had a duty under the lease to obtain an NFA following the discharge of contaminants from defendants' underground storage tanks and to render the property fully marketable by the conclusion of the lease term.

## III. DAMAGES

### A. *Loss of Use as a Measure of Damages*

As a threshold matter, we must determine whether New Jersey law recognizes loss of use as a measure of damages for breach of lease resulting in uncertainty impairing the marketability of real property. Jaasma contends that the District Court erred as a legal matter in holding that, under New Jersey law, the only two measures of damages for breach of lease are diminution in value and cost of repair or remediation. It is clear, however, that New Jersey recognizes lost rental income as a standard measure of damages for breach of a lease. *See McGuire v. City of Jersey City*, 593 A.2d 309, 315 (N.J. 1991); *River Road Assocs v. Chesapeake*

13

*Display & Packaging Co.,* 104 F. Supp. 2d 418, 425 (D.N.J. 2000) ("Under New Jersey law, a commercial landlord may recover for lost rental income resulting from a tenant's breach of a lease.").

Moreover, in both *T&E Indus., Inc. v. Safety Light Corp.*, 587 A.2d 1249, 1263 (N.J. 1991), and *Silgato v. State*, 632 A.2d 837, 842 (N.J. Super. Ct. App. Div. 1993), New Jersey courts recognized that loss of use is one of several possible measures of damages for tortious harm to real property. This comports with the common law of property, which includes loss of use or lost rental value as a proper measure of damages when land is temporarily unusable, but then later returned to its original state. *Thompson on Real Property* states:

> Loss of rental value may be the appropriate measure of damages, if the property itself is not harmed but its usefulness has been impaired . . . . If temporary damages are recovered for harm to property, those damages are measured by the loss of the rental value or loss of use value of the property as a result of or during the continuance of the nuisance.

8 *Thompson on Real Property* § 67.06(a)(2), at 119-20 (David A. Thomas ed. 1994); *see also* 9 *Powell on Real Property* § 64.07[3], at 64-42 (Michael Allan Wolf ed., Matthew Bender) ("When the harm caused by a nuisance is only temporary and can be abated, the measure of damages normally is the depreciation in the rental or use value of the affected property.").

The more difficult question, presented here, is whether damages for loss of use are available during the period of uncertainty which may occur after the clean-up is physically completed, but before the property has been certified as compliant with all environmental regulations. Jaasma argues that, even if the property did not in fact require any further environmental remediation after the termination of the lease, she suffered damages so long as the cloud of uncertainty from the prior contamination lingered.

We are satisfied that New Jersey law does recognize damages for the uncertainty that follows in the wake of environmental contamination. More specifically, *Bahrle v. Exxon Corp.*, 652 A.2d 178 (N.J. Super. Ct. App. Div.1994), supports the

proposition that New Jersey law recognizes an injury due to the temporary uncertainty surrounding the environmental status of property created by NJDEP investigation. In *Bahrle*, adjoining landowners sued the proprietors of a gasoline service station under a nuisance theory for groundwater contamination due to alleged spills from the station's underground storage tanks. The trial judge had dismissed the claims of seventeen plaintiffs whose water never registered as contaminated, but who lived within the "redlined" area where NJDEP prohibited new wells. The Appellate Division reversed, finding that even though these landowners' wells were not contaminated in fact, there was foreseeable damage caused by the redlining itself, including plaintiffs' hesitancy to use the water for drinking or showering during the pendency of the investigation. *Id.* at 194.

*NRC Corp. v. Amoco Oil Co.*, 205 F.3d 1007 (7th Cir. 2000), is also instructive. Amoco had leased land from NRC for a gasoline station. At the end of the lease period, it was discovered that the underground storage tanks were leaking and had contaminated the property. NRC sued Amoco for the loss of the use of the property during the remediation period, and the district court awarded the full fair rental value from the time of the termination of the lease until the Indiana Department of Environmental Management approved the corrective action plan and remediation was completed. *Id.* at 1013.

Amoco claimed that NRC could have used the property during the remediation and argued that NRC had voluntarily declined to market the property. The Seventh Circuit disagreed, concluding that the evidence established that "until the corrective action plan was approved . . . the property was unmarketable. After that time, while the property was undergoing remediation, uncertainty remained. Testimony demonstrated that lenders would be reluctant to get behind the property without guarantees that remediation was working." *Id.* We find this case persuasive.

We conclude that the District Court erred by limiting its assessment of damages to diminution of value or cost of remediation and thereby ignoring damages for temporary loss of use. Moreover, in light of *Bahrle*, we find that, even in the absence of actual pollution, a claim is cognizable under New Jersey law for the period of uncertainty following a pollution incident, particularly where that uncertainty is due to ongoing

15

investigation by the state environmental agency.[8]

## B. *Mitigation of Damages*

Defendants argue that Jaasma is entitled to loss of use damages only if she can establish that she reasonably mitigated her damages. *See McGuire*, 593 A.2d at 314; *Fanarjian v. Moskowitz*, 568 A.2d 94, 98 (N.J. Super. Ct. App. Div. 1989) (extending the mitigation of damages requirement to commercial leases). The issue of mitigation was not reached by the District Court because the Court disposed of the case on the issue of availability of damages; however, as it has been properly raised and could dispose of the case, we will address it on appeal. *See Storey v. Burns Intern. Sec. Svcs*, 390 F.3d 760, 761 n.1 (3d Cir. 2004) ("An appellate court may affirm a result reached by the district court for reasons that differ from the conclusions of the district court if the record supports the judgment.").

Under New Jersey law, "Whether the landlord's efforts to

---

[8]During oral argument on defendants' Rule 50 motion, the District Court questioned whether the delay in obtaining the NFA may have been due to "state bureaucracy," rather than caused by any failure on the part of defendants. The question of contractual liability for governmental delay is governed by the usual principles of consequential damages. New Jersey has adopted the traditional rule of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), that consequential damages are available for those delays that may "fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as the probable result of the breach." *Sandvik, Inc. v. Statewide Sec. Sys, Div. of Statewide Guard Servs, Inc*., 469 A.2d 955, 958 (N.J. Super. Ct. App. Div. 1983). Liability for bureaucratic delay following a breach of contract, like all consequential damages, therefore, is limited by reasonable foreseeability. Among the things that might be considered on remand is whether the delays incurred in this case were a foreseeable consequence of waiting to remove the tanks until one week before the lease terminated and whether such delays were contemplated by the parties when they executed the Addendum to the lease agreement.

16

mitigate its damages were reasonable is a question of fact." *See Harrison Riverside Ltd. P'ship v. Eagle Affiliates, Inc.*, 707 A.2d 490, 493 (N.J. Super. Ct. App. Div.1998). Moreover, New Jersey courts have recognized that landowners do not have an obligation to mitigate when such efforts would be fruitless. *See Borough of Fort Lee v. Banque Nat'l de Paris*, 710 A.2d 1, 7 (N.J. Super. Ct. App. Div. 1998).[9]

Defendants submit that Jaasma did not exercise the requisite diligence in attempting to market the property for lease or sale after the termination of the lease. Jaasma did not place the property on the market until May 2003, at which time she received three offers above the asking price and a lease offer for over $5,000 a month more than defendants had been paying.

Jaasma, on the other hand, testified that she approached three realtors about marketing the property, each of whom told her that she would be "very unlikely to seize [sic] any money until we had . . . specific and clear evidence . . . from Shell that there was no further action required with respect to any contamination." SA2. Jaasma represents that for the first eight months, defendants would not provide her with any information about the environmental status of the property, and that she was unable to get confirmation even that the tanks had been removed. Additionally, Jaasma received NJDEP's April 5, 2002, letter, which established that the soil samples were clean, but which also required defendants to continue testing—a process that entailed the installation of monitoring equipment on the property and could have led to additional remediation requirements.

Jaasma further claims that the defendants' first disclosure was not until June 2002, at which time the defendants provided only the Tank Closure report, but not further information about the

---

[9]In *Borough of Fort Lee,* the Court found that a tenant's holdover "so chilled the leasing market for the property that it would have been fruitless [to mitigate damages by conducting necessary repairs] until [the landowner] could be assured that tenant would vacate." 710 A.2d at 7. Therefore, the Court held that the landlord was not obligated "to risk lowering the long term value of the property by leasing to less discriminating class C tenants." *Id.*

17

status of the environmental investigation of the property. Jaasma therefore argues that it was not until May 2003 that she reasonably believed that the NFA was sufficiently imminent that she could successfully market the property.

New Jersey regulations do not require that an NFA be issued prior to the sale of a retail gasoline station. *See* N.J.A.C. 7 § 26B-1.4. Nevertheless, retail gasoline stations are subject to the technical requirements for site remediation which must continue until NJDEP issues an NFA. *See* N.J.A.C. 7:26C-2.6 (setting forth the prerequisites for obtaining an NFA). Jaasma represents that, once she listed the property with a realtor, all serious bidders required an NFA or assurances of environmental safety as a condition of closing, which she could not provide during the pendency of the NJDEP investigation. Thus, she claims that the offers cited by defendants were made on the express precondition that an NFA would be obtained.

After evaluating the record, we find that Jaasma has adduced sufficient evidence that a jury could find that she made reasonable efforts to mitigate, given the uncertainty surrounding the property's environmental status. Moreover, even if Jaasma made insufficient mitigation efforts, that fact might not foreclose her entire claim, but would only diminish the damage award by the amount that she could have received if she had engaged in reasonable mitigation. *See Harrison Riverside Ltd. P'ship*, 707 A.2d at 492 (holding that plaintiff's failure to mitigate does not preclude all recovery, but bars a landlord's recovery against the breaching tenant only to the extent that damages reasonably could have been avoided). Because the mitigation issue is fact-bound, and given the evidence of the futility of mitigation efforts during the period of ongoing NJDEP investigation, we conclude that judgment as a matter of law is not appropriate on the grounds of lack of reasonable mitigation.

## IV. EXCLUSION OF GARY J. DIPIPPO'S TESTIMONY

Jaasma argues that the District Court erred in excluding the testimony of her expert, Gary J. DiPippo. The District Court concluded that DiPippo would not be able to give a reliable opinion regarding the environmental status of the property in 2001 because the only available soil and groundwater data was from 1996 and

2003. Therefore, the Court found that "[a]ny conclusion that the health hazard existed at the end of the lease term is . . . too speculative to be admissible, particularly in the context of later tests in 2003, two years later, indicating that there is no health hazard apparently or benzine is not present." We review the decision to admit or reject expert testimony under an abuse of discretion standard. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also United States v. Trala*, 386 F.3d 536, 541 (3d Cir. 2004).

To qualify as an expert under Fed. R. Evid. 702, a witness must have sufficient qualifications in the form of knowledge, skills, and training. *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 155 (3d Cir. 1999). In addition, expert testimony must satisfy the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), that the expert testimony (1) must be based on sufficient facts and data; (2) must be the product of a reliable methodology; and (3) must demonstrate a relevant connection between that methodology and the facts of the case. In short, an expert must have the requisite "qualifications, reliability, and fit." *Unisys Sav. Plan*, 173 F.3d at 156.

The District Court does not appear to have questioned DiPippo's qualifications, and it seems clear from the record that DiPippo's qualifications pass muster. He is a civil and environmental engineer who is registered in New Jersey and is a manager of an environmental consulting firm. He has been working in environmental engineering for thirty years and has extensive experience in the area of environmental remediation and regulatory compliance.

The District Court instead used the reliability calculus to exclude DiPippo's testimony. The Court apparently believed that DiPippo was going to testify to the actual condition of the property as of October 31, 2001, based on extrapolations from the available data. Jaasma correctly contends that the Court misunderstood the purpose of DiPippo's testimony. Jaasma's proffer was not that DiPippo would have testified to the actual condition of the property in 2001, but rather that he would have established the *uncertainty* surrounding the environmental status of the property between the termination of the lease in 2001 and the issuance of the NFA in 2004. He also would have offered his opinion that Jaasma's decision to delay marketing the property was reasonable

19

because, even in the face of below-regulation levels of hazardous substances in 1996, the data left open the potential for danger in 2001.

In his deposition testimony, DiPippo offered several reasons why Jaasma might reasonably worry about the environmental safety of the property at the time the lease was terminated, notwithstanding that the 1996 test data (the most recent testing available as of 2001) revealed that the concentrations of contaminants were below regulatory levels. First, he stated that it was not clear from the 1996 groundwater and soil samples that there was no "continuous source" of contamination because "two of the highest concentrations noted for benzene . . . in the vicinity of the tanks . . . occurred in the later years." Thus, DiPippo represented that he could not definitively determine from the 1996 data whether the concentrations of benzene, for example, would continue to decline after 1996. In addition, he could not say, without further information, whether certain compounds had degraded or would continue to degrade during that time.

Second, DiPippo testified that the samples taken October 30, 2001, were "of inadequate size to do volatiles analysis . . . So that while I look at these numbers and they all are below those cleanup criteria, there is still this question lingering about whether those results should be relied upon at this point." Finally, DiPippo stated that, even considering the data from the most recent sampling in 2003, "there are some lingering questions on the site" as to the risk of "vapor intrusion" because the concentrations previously thought safe are now considered to have been too permissive.

In Jaasma's submission, this testimony is highly relevant to her damages claim and to the reasonableness of her caution in marketing the property once the petroleum leak was discovered. We agree with Jaasma that, while it may have been speculative for DiPippo to testify to the actual condition of the property in 2001, there appears to be nothing unreliable about DiPippo's testimony regarding the uncertainty surrounding the property during that time.

Defendants' main counterargument is that DiPippo's report is "merely a summary of the environmental documents submitted by defendants" which was not based on "independent testing." This argument has no support. We do not require an expert to base

20

his or her opinions on independent data collection or field research; rather, the question is "whether an expert's data is of a type reasonably relied on by experts in the field . . . [and] whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *In re TMI Litigation*, 193 F.3d 613, 697 (3d Cir. 1999); *see also* Fed. R. Evid. 703 . There is no doubt that the *data* DiPippo relied upon was reliable. Instead the question was whether DiPippo was justified in making conclusions about the uncertainty surrounding the environmental status of the property in 2001 based on 1996 and 2003 data.

In sum, DiPippo's testimony satisfies the *Daubert* standard. He clearly has the requisite qualifications. His proposed testimony "fits" as it goes to the risks associated with remediation efforts, which are relevant to Jaasma's claim for damages and her mitigation argument. Because the District Court's decision to exclude DiPippo was based on a misunderstanding of the purpose of the expert testimony, and because the testimony appears to meet the *Daubert* standard, we find that the Court abused its discretion.

V.

For the foregoing reasons, we will reverse the decision of the District Court granting defendants judgment as a matter of law and excluding Jaasma's expert, Gary J. DiPippo, and will remand this case for further proceedings consistent with this opinion.